Wade A. KILPATRICK, et al.,
Plaintiffs,

Stan E. Golub, et al.,
Plaintiffs–Appellants,

v.

John C. RIDDLE, et al., Defendants,

The Federal Deposit Insurance Corp., as Receiver for First RepublicBank Houston, N.A., et al., Defendants–Appellees.

No. 89–2963.

United States Court of Appeals,
Fifth Circuit.

July 25, 1990.

**1524**

J. Eugene Clements, Evelyn V. Keyes, Porter & Clements, Houston, Tex., for plaintiffs-appellants.

Robert D. Daniel, Houston, Tex., for defendants-appellees.

Before BROWN, JOLLY and DAVIS, Circuit Judges.

E. GRADY JOLLY, Circuit Judge:

This case presents the following question: Does the *D'Oench, Duhme* doctrine,[1] which protects the Federal Deposit Insurance Corporation from the effect of unrecorded agreements between an insured bank and its customers, preclude borrowers who were defrauded by failed banks, from bringing an action under federal securities laws against the FDIC as receiver? Although several circuits have touched on this question, none have squarely considered it. Supreme Court precedent, however, now makes clear that debtors may not raise bank fraud as a defense to the FDIC's collection efforts. The *D'Oench, Duhme* doctrine would be effectively nullified if borrowers could characterize their fraud-based defenses as independent causes of action and maintain them against the federal receiver. Thus, although the plaintiffs may, of course, pursue actions for securities fraud against the individuals involved, we conclude that they may not recast their barred defenses as causes of action under the federal securities laws.

I

This case arises from a summary judgment granted defendants, the FDIC, and NCNB, the bridge bank used to rescue the failed institutions in this case. The plaintiffs are investors who executed promissory notes in favor of First RepublicBank ("FRB"), the failed bank. When FRB failed, these notes were acquired by the FDIC in its capacity as receiver. The FDIC then assigned the plaintiffs' notes to the bridge bank. The plaintiffs originally sued FRB for alleged fraud in the promotion and sale of certain bank stock, which FRB underwrote by inducing the plaintiffs to execute the promissory notes at issue. The plaintiffs then added the defendants FDIC and NCNB, as successors-in-interest.

This litigation has a complex procedural history that is not relevant to the issue on appeal. As this case appears before us, the

---

1. The doctrine was originally stated in *D'Oench, Duhme & Co. v. FDIC,* 315 U.S. 447, 62 S.Ct. 676, 86 L.Ed. 956 (1942), and was later codified at 12 U.S.C. § 1823(e).

plaintiffs seek rescission of these notes on the ground that they are invalid because they were originally obtained through fraud. They allege that FRB assisted two men, who were heavily in debt to it, in a scheme to defraud investors. The two alleged swindlers promoted a plan to open several branches of the Texas National Bank (TNB). FRB financed the plan by loaning the investors money for the purchase of new TNB stock. The investors executed promissory notes and FRB thus acquired new collateral for the debts owed it by the alleged swindlers.

The plaintiffs allege fraud in that FRB never told them that the TNB stock was subject to a voting trust, which gave control over the stock to the two alleged swindlers. Furthermore, the plaintiffs allege that the stock was overvalued, and that the new banks were doomed to fail from the outset, and that this was all known by FRB. In the end, however, the net result of the stock-for-promissory note transactions was to give FRB fresh obligations from creditworthy investors by simply loaning money for a very short time in paper transactions that were essentially riskless to FRB. Although it was FRB that is alleged to have committed the fraud, the plaintiffs contend that the FDIC had acquired knowledge of FRB's fraud by the time it became receiver, because it had previously participated in litigation involving the failed TNB branches. Since the FDIC knew of FRB's fraud, and informed NCNB of it, neither the FDIC nor NCNB can escape FRB's liability as "innocent purchasers" of the notes.

The plaintiffs seek recovery from the FDIC and NCNB on eight bases, all of which involve alleged misrepresentation or fraud on the part of the alleged swindlers and FRB. Among these causes of action are claims under federal and state securities laws.[2] They assert that the FDIC was liable for FRB's fraudulent actions, and thus cannot collect on the notes, because it acquired them with actual knowledge of

the fraud gained from its participation in the TNB litigation. NCNB, as assignee of FDIC, can have no greater right to collect on them than did the FDIC. NCNB counterclaimed to enforce the notes.

The defendants rely on the *D'Oench, Duhme* doctrine in two ways: they argue that it is a complete defense to the investors' fraud claims and that it bars their defenses against enforcement of the notes. The district court granted summary judgment to the defendants. It concluded that the federal common law *D'Oench, Duhme* doctrine, which precludes defenses to recovery against a closed bank that are premised on undisclosed agreements between the borrower and the bank, both barred the plaintiffs' claims and allowed the defendants' counterclaims. Plaintiffs filed a timely notice of appeal.

## II

The plaintiffs raise three arguments. First, although they concede that the *D'Oench, Duhme* doctrine precludes many of their claims, they contend that it cannot bar their actions under the federal securities laws. Second, they argue that the FDIC and NCNB cannot escape liability for securities violations as "innocent purchasers" under section 29 of the Securities Exchange Act, because they took the notes with actual knowledge of the plaintiffs' claims and defenses. Finally, they argue that summary judgment was inappropriate because genuine issues of material fact remain concerning misrepresentations made by FRB in the issuance of the securities. Our resolution of the first issue is dispositive of the entire appeal.

## III

The essence of the plaintiffs' argument is that the *D'Oench, Duhme* doctrine cannot bar their federal securities law claims, because this result would empower the FDIC to enforce agreements that are il-

---

**2.** Their claims are based on section 10(b) of the Securities Exchange Act of 1934 and Rule 10b–5, section 33 of the Texas Securities Act, civil conspiracy, statutory and common law fraud, breach of the duty of good faith and fair dealing, and violations of section 29 of the Securities Exchange Act of 1934 and section 12(2) of the Securities Act of 1933.

legal under federal securities laws. They contend that the Supreme Court has held insolvent national banks liable for misrepresentations made in the sale of their own stock,[3] and that this court has not held that the *D'Oench, Duhme* doctrine trumps federal securities law. They further argue that, as a policy matter, protecting investors by holding the FDIC liable for securities fraud on the part of failed banks need not undercut the system of national bank regulation. They assert that the FDIC's liability may appropriately be limited to cases in which it assumes a failed bank's liabilities with actual knowledge of the bank's fraudulent securities dealings. Given the FDIC's participation in the TNB litigation, the plaintiffs argue that the FDIC had knowledge of the fraud behind this transaction before it acquired FRB and consequently was not an "innocent purchaser" of the notes in question.

Although the plaintiffs are correct that only one court has explicitly held that federal securities claims may be barred by the *D'Oench, Duhme* doctrine, recent Supreme Court precedent makes clear that claims that are in essence indistinguishable from those the plaintiffs seek to maintain are barred by the doctrine. Moreover, several courts have held that the doctrine bars *state* securities fraud claims, which often provide causes of action that overlap the

federal securities laws. Finally, and most importantly, permitting borrowers to maintain federal securities claims would enable them to simply recast as affirmative causes of action the very defenses that the Supreme Court has long held are precluded by the doctrine.

### A

■ The *D'Oench, Duhme* doctrine, as originally stated, holds that when a federally insured bank fails, borrowers from the bank may not later defend against collection efforts of a federal receiver by arguing that they had an unrecorded agreement with the bank. *D'Oench, Duhme & Co. v. FDIC,* 315 U.S. 447, 459–60, 62 S.Ct. 676, 680, 86 L.Ed. 956 (1942). In *D'Oench,* the borrower had executed obligations to an insured institution but claimed, after the bank failed, that the bank had orally agreed that these obligations would not be enforced. This oral side arrangement became the paradigmatic "secret agreement" barred by the doctrine. Congress has embodied this common law doctrine in statute.[4] As codified, the doctrine precludes borrowers from avoiding obligations to failed banks unless they have an arrangement in writing, that was executed by the bank and the borrower, approved by the bank's board and listed in the bank's records.[5]

---

**3.** *Oppenheimer v. Harriman Nat'l Bank & Trust Co. of City of N.Y.,* 301 U.S. 206, 57 S.Ct. 719, 81 L.Ed. 1042 (1937). *Oppenheimer,* decided several years before *D'Oench, Duhme & Co. v. FDIC,* 315 U.S. 447, 62 S.Ct. 676, 86 L.Ed. 956 (1942), simply holds that bank stockholders defrauded into purchasing bank stock have the same priority after the bank fails as other unsecured creditors. It says nothing about their ability to recover from a federal receiver.

**4.** There are two *D'Oench, Duhme* doctrines, one statutory (12 U.S.C. § 1823(e)) and one of common law. Until recently, only the common law version protected the FDIC when it acted in its capacity as receiver. *See Beighley v. FDIC,* 868 F.2d 776, 783 (5th Cir.1989) ("Section 1823(e) is not available as a bar to claims of defenses against the FDIC when it is acting in its capacity as receiver"). On August 9, 1989 Congress amended the statutory version, making it available to the FDIC–Receiver. 12 U.S.C. § 1823(e). This action was brought before section 1823(e) was amended, and involves the FDIC in its ca-

pacity as receiver. We need not consider, however, whether this change applies to this case, because we have long held that both doctrines bar similar defenses by borrowers. *See Beighley v. FDIC,* 868 F.2d 776, 784 (5th Cir.1989) (noting that "[c]ourts often consider the [common law] *D'Oench, Duhme* doctrine and § 1823(e) in tandem, looking to the common law when construing the statute") and cases cited therein; *Olney Sav. & Loan Ass'n v. Trinity Banc Sav. Ass'n,* 885 F.2d 266, 274 (5th Cir.1989) ("[a]s the aims of § 1823(e) and *D'Oench* are identical and § 1823(e) is a codification of *D'Oench* and its progeny, the reasoning applied in § 1823(e) cases is applicable to *D'Oench* cases"). *See also FDIC v. Condit,* 861 F.2d 853, 858, n. 5 (5th Cir.1988).

**5.** 12 U.S.C. § 1823(e) provides:

(e) Agreements against interests of Corporation
No agreement which tends to diminish or defeat the interest of the Corporation in any asset acquired by it under this section or section

As the Supreme Court has recently explained, the doctrine has two purposes.

One purpose ... is to allow federal and state bank examiners to rely on a bank's records in evaluating the worth of the bank's assets.... A second purpose ... [is to] ensure mature consideration of unusual loan transactions by senior bank officials, and prevent fraudulent insertion of new terms, with the collusion of bank employees, when a bank appears headed for failure.

*Langley v. FDIC,* 484 U.S. 86, 91–92, 108 S.Ct. 396, 401, 98 L.Ed.2d 340 (1987). Since the initial statement of the doctrine in *D'Oench, Duhme,* the Court has expanded its preclusive effect well beyond the context of an oral "secret agreement" between the bank and the borrower. Most recently, in *Langley* the Supreme Court extended the doctrine to preclude the same defense that the plaintiffs seek to advance here: that the obligation to the failed bank was procured through fraud in the inducement.

In *Langley,* the Langleys borrowed money from a bank in order to buy land, and executed a mortgage as security for the loan. After the bank failed the Langleys sued it, claiming that the bank had deceived them concerning the land's value. They alleged that the bank had represented the land as larger and more valuable than it in fact was. None of these representations were recorded in any of the loan documents.

As receiver, the FDIC acquired the Langleys' mortgage among the bank's assets and sought to enforce it. The Langleys claimed that the mortgage was unenforceable because it had been predicated on fraud. They argued that the statute bars only defenses based on an unrecorded "agreement," and an agreement obviously requires mutual consent. Their defense, by contrast, alleged an unrecorded misrepresentation by the defrauding bank. Unilateral misrepresentation, their argument urged, is not an "agreement," and thus is not barred by the *D'Oench, Duhme* doctrine.

 The Court rejected the Langleys' argument and held that agreements invalidated by section 1823(e) include "agreements" predicated on fraud, noting that *D'Oench, Duhme* itself applied whenever the maker "lent himself to a scheme or arrangement whereby the banking authority ... was likely to be misled." 315 U.S. at 460, 62 S.Ct. at 681. Unwritten representations concerning the actual size of the land or the value of the mineral deposits would naturally mislead an outside examiner, simply because they were unwritten. "Certainly, one who signs a facially unqualified note subject to an unwritten and unrecorded condition upon its repayment has lent himself to a scheme or arrangement that is likely to mislead the banking authority, whether the condition consists of performance of a counter-promise (as in *D'Oench, Duhme* ) *or of the truthfulness of a warranted fact."* 484 U.S. at 93, 108 S.Ct. at 402 (emphasis added).[6] Thus, it is now clear that borrowers who execute facially unqualified obligations may not prevent a federal receiver's collection efforts by

---

1821 of this title, either as security for a loan or by purchase or as receiver of any insured depository institution, shall be valid against the Corporation unless such agreement—

(1) is in writing,

(2) was executed by the depository institution and any person claiming an adverse interest thereunder, including the obligor, contemporaneously with the acquisition of the asset by the depository institution,

(3) was approved by the board of directors of the depository institution or its loan committee, which approval shall be reflected in the minutes of said board or committee, and

(4) has been, continuously, from the time of its execution, an official record of the depository institution.

**6.** The Supreme Court did identify one exception to the broad reach of section 1823(e) but it is inapplicable in this case. Where the bank engages in fraud "in the *factum* " rather than fraud in the inducement, there is no valid obligation on the part of the borrower under the principle that fraud vitiates consent. The borrowers here knowingly executed promissory notes in favor of FRB. They claim that they did not realize the risk of the venture because of the disguised voting trust, the heavy indebtedness of the promoters, and the inflated value of the TNB stock. These are allegations of fraud in the inducement. The plaintiffs' obligations to the bank, and thus to NCNB, would therefore be voidable rather than void.

claiming that they were induced to execute the obligations by fraud.

**B**

■ As we have noted, the plaintiffs have alleged that they were fraudulently induced to execute promissory notes. The notes were part of a scheme in which they were induced to purchase worthless stock with the loan proceeds. Viewing the facts and inferences in the light most favorable to the nonmovants, we presume, without deciding, that the plaintiffs have stated a claim for securities fraud against the promoters and FRB. *Barrett v. Computer Servs., Inc.*, 884 F.2d 214, 215 (5th Cir. 1989). We also observe at the outset that if the *D'Oench, Duhme* doctrine protects the FDIC, it also protects NCNB, because "we recently extended *D'Oench, Duhme* to 'assignees of the FDIC.'" *Porras v. Petroplex Sav. Ass'n*, 903 F.2d 379, 381 (5th Cir.1990) (citing *Bell & Murphy & Assocs. v. Interfirst Bank Gateway*, 894 F.2d 750, 754–55 (5th Cir.1990)).

■ It is further clear that if the plaintiffs' defenses are barred by the *D'Oench, Duhme* doctrine, then their defenses framed as causes of action must also be barred, because any other result would nullify the doctrine. *Bell & Murphy & Assocs. v. Interfirst Bank Gateway*, 894 F.2d 750, 753 (5th Cir.1990) ("this argument [is] meritless in light of our recent holding in *Beighley* that the *D'Oench, Duhme* rule bars affirmative claims based upon unrecorded agreements"). Furthermore, prior knowledge of FRB's alleged fraud that the FDIC may have gained from the TNB litigation will not aid the plaintiffs' defense, because "even if the FDIC had knowledge of the oral misrepresentation prior to its acquisition of the note[s], such knowledge is not relevant to whether § 1823(e) applies. The voidable interest is transferable whether or not FDIC knows of the misrepresentation or fraud which produces the voidability." *FDIC v. Kratz*, 898 F.2d 669, 671 (8th Cir.1990) (citing *Langley*). *See also FDIC v. Roldan Fonseca*, 795 F.2d 1102, 1107 (1st Cir.1986) (claim of knowledge is "precisely what

FDIC is protected from by virtue of Section 1823(e)"). The question then is this: may the plaintiffs distinguish themselves from all the previously cited authority, and defend against the collection efforts of the federal receiver on the ground that the "agreement" violated federal securities laws? In a word, no.

It seems clear to us that under the rule of *Langley* and the principles underlying the *D'Oench, Duhme* doctrine, the plaintiffs' claims and defenses must be barred. We think that *Langley v. FDIC* refutes the plaintiffs' arguments since it barred a borrower's defense that is essentially indistinguishable from the plaintiffs' claims in this case. "Following *Langley,* we have held that misrepresentations to borrowers cannot be asserted as a defense to recovery by the FSLIC on facially unqualified loan documents." *McLemore v. Landry*, 898 F.2d 996, 1002 (5th Cir.1990). As in *Langley,* the borrowers here argue that certain warranted facts concerning their loans, namely the value of the underlying asset securing their promissory notes, were misrepresented to them by the bank. Except for the fact that the asset in this case is stock rather than land, and its sale thus regulated by federal law, the cases are the same.

It is true that only one court has expressly rejected federal securities law defenses on the basis of the *D'Oench, Duhme* doctrine. In *FDIC v. Investors Associates X, Ltd.*, 775 F.2d 152, 156 (6th Cir.1985), the court rejected arguments of "fraud in the inducement, and state and federal securities law defenses" asserted against the FDIC. *But see Gilman v. FDIC*, 660 F.2d 688, 693–94 (6th Cir.1981) (suggesting possible right of borrowers to rescind obligations made in violation of securities laws), and *Gunter v. Hutcheson*, 674 F.2d 862, 874 (11th Cir.1982) (identifying but not deciding question). These decisions were all rendered before the Supreme Court's decision in *Langley*. Although no Fifth Circuit case has expressly extended the *D'Oench, Duhme* doctrine to bar claims arising under the federal securities laws, this court has held (after *Langley* was decided) that a plaintiff cannot assert similar

state common law claims of fraud, breach of contract, or breach of fiduciary duty against an FDIC receiver. *Beighley v. FDIC*, 868 F.2d 776, 784, n. 12 (5th Cir. 1989).

We find the fact that the "agreement" in this case allegedly involved securities fraud is unimportant for purposes of *D'Oench, Duhme* analysis. It is not the nature or enforceability of an agreement between a bank and borrower that controls the application of the *D'Oench, Duhme* doctrine; if the agreement is unwritten, *D'Oench, Duhme* applies. *D'Oench*, 315 U.S. at 459, 62 S.Ct. at 680. *See also* 12 U.S.C. § 1823(e). The plaintiffs contend, nevertheless, that a "balancing of federal policies ... demands that investor protection embodied in the securities laws outweigh the federal policies behind the *D'Oench, Duhme* doctrine." We do not see that this case requires striking such a balance.

First, as we have noted earlier, precluding this action does not deprive the plaintiffs of protection under the federal securities laws. They may sue the individuals who actually defrauded them. Application of the doctrine here only denies a certain remedy, namely, rescission of voluntarily undertaken obligations to the federally insured bank. Second, no authority suggests a right to be compensated by the federal government because one's investments fail. Although there is no federal policy of protecting investors by the government underwriting privately issued securities,[7] *Huddleston v. Herman & MacLean*, 640 F.2d 534, 549 (5th Cir.1981) there is a federal policy of protecting federally insured banks from the effect of unrecorded agreements. Obviously, *D'Oench, Duhme* is not designed to protect investors. The "doctrine thus favors the interests of depositors and creditors of a failed bank, who cannot protect themselves from secret agreements, over the interests of borrowers, who can."

7. As a matter of equity, we see no reason the plaintiffs should be in a better position simply because the institutions that defrauded them happened to fail rather than survive. We reiterate that barring their suit against the federal receiver does not preclude their suing the individuals who actually defrauded them.

*Campbell Leasing, Inc. v. FDIC*, 901 F.2d 1244, 1248 (5th Cir.1990).

Finally, this result is not only consistent with recent precedent concerning the scope of the *D'Oench, Duhme* doctrine, but also reaffirms a basic principle underlying that doctrine, which is of particular relevance today. It is the "federal policy to protect [the FDIC] *and the public funds which it administers* against misrepresentations as to the securities or other assets in the portfolios of the banks which [it] insures or to which it makes loans." *D'Oench, Duhme & Co. v. FDIC*, 315 U.S. 447, 457, 62 S.Ct. 676, 679, 86 L.Ed. 956 (1942). This policy is undermined just as much by unrecorded representations regarding securities as by secret agreements that condition the enforceability of obligations to a federally insured bank. We must therefore conclude that claims under the federal securities laws provide no basis from which to carve an exception from the *D'Oench, Duhme* doctrine.

### IV

Because we conclude that the *D'Oench, Duhme* doctrine bars the plaintiffs' claims and defenses even if FRB committed fraud of which the FDIC had knowledge, we need not consider whether the defendants are "innocent purchasers" or whether there were genuine issues of material fact concerning the alleged fraud.

For the foregoing reasons, the judgment of the district court is

AFFIRMED.

JOHN R. BROWN, Circuit Judge, dissenting.

I must dissent with the Court's main holding in this case. The question is whether the *D'Oench, Duhme* doctrine[1] and it's so-called codified counter-part,[2] 12

1. *D'Oench, Duhme & Co. v. FDIC*, 315 U.S. 447, 62 S.Ct. 676, 86 L.Ed. 956 (1942).

2. The often recited statement that § 1823(e) is a codification of *D'Oench, Duhme* does not bear analysis. The specific requirements of § 1823(e) are in no way provided, or even mentioned, in *D'Oench, Duhme*.

U.S.C. § 1823(e),[3] estop all defenses to the repayment of loans of failed banks which the FDIC has assumed in receivership. Is the doctrine so powerful and all encompassing that nothing can stand in its way, including federal statutes protecting investors? In my judgment, the answer has to be no. There is a limit to the protection needed by the FDIC.

## I.

I do concur with the Court on several points. It is well established that when the *D'Oench, Duhme* doctrine applies, 1) the debtor will not be allowed to frame his defenses as an affirmative cause of action, and 2) bridge banks will be afforded the same protection as the FDIC.[4] I also agree that the evidence must be looked at in the light most favorable to the non-movants (investors) and assume, as does the Court for purposes of summary judgment, that they have stated a question of fact about the securities fraud against the promoters and FRB.

The FDIC asserts that the *D'Oench, Duhme* doctrine estops the appellants-investors from using an affirmative claim of fraud in the sale of securities to negate the obligation on certain notes and guarantees. The fraud claim is based on the Securities Exchange Act of 1934, § 29.[5] The appellants claim that FRB violated the Securities Act in several ways. 1) Although the bank knew that Riddles and Suttles were millions of dollars in debt they continued to promote the sale of stock; 2) the bank failed to disclose the actual precarious financial position of TNB when they promoted the sale of stock; and 3) the bank did not reveal the nature of the voting stock.[6]

The implication of the FDIC's position is an unacceptable expansion of both the common law and § 1823(e).

Until today, this Circuit has not ruled on whether *D'Oench, Duhme* should preclude fraud defenses based on federal securities

---

The requirement that the agreement of non-liability be in writing and approved by the bank board of directors and contained in the permanent records (see items 1–4 of § 1823(e)) are not the work of the Supreme Court as reflected in this much cited opinion. These are exclusively the work of Congress.

The distinction is more than rhetorical. The test established in *D'Oench, Duhme* is "whether the note was designed to deceive the creditors or the public authority, or would tend to have that effect." *D'Oench, Duhme,* 315 U.S. at 460, 62 S.Ct. at 681, 86 L.Ed. at 963.
If § 1823(e) does not apply (see Majority Opinion, *supra* note 4), a failure to comply specifically with the requirements of § 1823(e) will not be prima facie evidence of the applicability of *D'Oench, Duhme.*

**3.** 12 U.S.C. § 1823(e):
No agreement which tends to diminish or defeat the right, title or interest of the Corporation in any asset acquired by it under this action, either as security for a loan or by purchase, shall be valid against the corporation unless such an agreement
(1) shall be in writing,
(2) shall have been executed by the bank and the person or persons claiming an adverse interest thereunder, including the obligor, contemporaneously with the acquisition of the asset by the bank,
(3) shall have been approved by the board of directors of the bank or its loan committee, which approval shall be reflected in the minutes of said board or committee, and

(4) shall have been, continuously, from the time of it's execution, an official record of the bank.

**4.** *Bell & Murphy & Assocs. v. Interfirst Bank Gateway,* 894 F.2d 750, 754–55 (5th Cir.1990); *Porras v. Petroplex Savings Assoc.,* 903 F.2d 379 (5th Cir.1990).

**5.** § 29 as codified by 15 U.S.C. § 78cc:
(b) Every contract made in violation of any provision of this chapter or any rule or regulation thereunder, and every contract (including any contract for listing a security on an exchange) heretofore or hereafter made, the performance of which involves the violation of, or the continuance of any relationship or practice in violation of any provision of this chapter or any rule or regulation thereunder, shall be void (1) as regards the rights of any person who, in violation of any such provision, rule, or regulation, shall have made or engaged in the performance of any such contract and (2) as regards the rights of any person who, not being a party to such contract, shall have acquired any right thereunder with actual knowledge of the facts by reason of which the making or performance of such contract was in violation of any such provision, rule or regulation: 15 U.S.C. § 78cc (underline added).

**6.** In their original complaint, the plaintiffs alleged that FRB violated 15 U.S.C. § 78j(b), 17 C.F.R. § 240.10b–5, and 15 U.S.C. § 78t.

law. However, the 11th Circuit dealt with the issue in *Gunter v. Hutcheson*, 674 F.2d 862 (11th Cir.1982), *cert. denied*, 459 U.S. 826, 103 S.Ct. 60, 74 L.Ed.2d 63 (1982). "We are less confident that these Federal policies behind the FDIC act [*D'Oench, Duhme* doctrine] outweigh the strong policies of investor protection embodied in securities law." *Gunter*, 674 F.2d at 874.

In light of the current savings and loans' crisis which may cost taxpayers up to $500 billion, President Franklin Roosevelt's letter to the 73rd Congress, urging the passage of the Securities Act of 1933 [7] continues to reflect strong congressional policy: "What we seek is the return to a clearer understanding of the ancient truth that those who manage banks, corporations, and other agencies handling or using other people's money are trustees acting for others." [8] The policy of fiduciary responsibility and good faith securities dealing should not be summarily overridden by the policy of assuring full information to bank regulators as reflected in the *D'Oench, Duhme* doctrine.

The Securities Exchange Act is different from state and common law fraud claims for several reasons: 1) Unlike state and common law fraud claims, the Act makes the transaction *void*, not merely voidable; 2) the necessity for uniform adjudication of a peculiarly federal problem is satisfied because the Act is a federal statute; and 3) the statute also provides the FDIC protection from most actions under the Securities Act since actual participation or knowledge of the fraudulent transaction on the part of the FDIC is required.[9]

In *Langley v. FDIC*, 484 U.S. 86, 108 S.Ct. 396, 98 L.Ed.2d 340 (1987), the Supreme Court held that fraud in the inducement by the lending bank was precluded by *D'Oench, Duhme* and § 1823(e). However, the Court pointed out that the doctrine will not always apply: "The presence of fraud could be relevant, however, to another requirement of § 1823(e), namely the requirement that the agreement in question 'tend ... to diminish or defeat the right, title or interest' of the FDIC." *Langley*, 484 U.S. at 93, 108 S.Ct. at 402, 98 L.Ed.2d at 348. *Olney Sav. & Loan Ass'n v. Trinity Banc Sav. Ass'n*, 885 F.2d 266, 275 (5th Cir.1989).

Fraud under the Securities Act is significant since it renders the entire instrument void. If void, the FDIC never acquired an interest in the theoretically non-existent "note" in the first place. The Court specifically allows the defense of fraud in the factum. Because of its language, § 29 also fits into this narrow exception: "Every contract made in violation ... *shall be void*." 15 U.S.C. § 78cc(b).

The FDIC argues that void should be read as voidable and cites *Gunter*. The Court also states that because the fraud is merely fraud in the inducement, the contract is merely voidable. However, the 11th Circuit in *Gunter* said that "void" could be read only as "voidable" "to assure that the party who has violated the securities laws cannot escape liability ... no countervailing reasons exist to limit the express protection afforded innocent purchasers of debt securities by § 29." *Gunter*, 674 F.2d at 876. The 5th Circuit also dealt with the construction of § 29. In *Regional Properties v. Financial Real Es-*

---

7. The Securities Act of 1933 preceded the Securities Exchange Act of 1934. The 1934 Act was a continuation of the policies which were enacted in 1933.

8. H.R. Report No. 85, 73rd Cong. 1st sess., —— (1933).

9. The pertinent section provides:

 (c) Nothing in this chapter shall be construed (1) to affect the validity of a loan or extension of credit ... unless at the time of making the loan or extension of credit ... the person making such loan or extension of credit ...

or acquiring such lien shall have actual knowledge of facts by reason of which the making of such a loan or extension of credit ... or the acquisition of such lien is a violation of the provisions of this chapter or any rule or regulation thereunder, or (2) to afford a defense to the collection of any debt or obligation or the enforcement of any lien by any person who shall have acquired such debt, obligation, or lien in good faith for value and without actual knowledge of the violation of any provision of this chapter or any rule or regulation thereunder affecting the legality of such debt, obligation, or lien. 15 U.S.C. § 78cc(c) (underline added).

*tate Consulting Co.,* 678 F.2d 552 (5th Cir.1982) this Court pronounced that its earlier position that § 29 made the contract "void ab initio" [10] should be changed to the extent that violators of the act could not use the "void" language to rescind a contract to the detriment of an innocent party.[11] Because there is, in this case, no reason to read "void" as "voidable" to protect the innocent purchaser the Court is left with the statute as written.

Section 1823(e) protects FDIC from "agreements which tend to diminish or defeat the interest of the Corporation in any asset acquired by it...." [12] This will protect the FDIC in the majority of cases. It will not be successful when 1) the debtor is able to meet the four requirements of § 1823(e), or 2) there is no actual agreement at all.

Naturally I accept the Supreme Court's broad definition of agreement. "As used in commercial and contract law, the term 'agreement' often has 'a wider meaning than promise ... and embraces such a condition on performance.'" *Langley,* 484 U.S. at 91, 108 S.Ct. at 401, 98 L.Ed.2d at 346. The conditions precedent to the performance are also part of the agreement. FDIC contends that the statutory requirement that the FRB not act fraudulently in the sale of stock is a condition to repayment. Because the investors did not write down that FRB was not to defraud them, the investors cannot rescind the fraudulent contracts. This is stretching the intent of the doctrine beyond reasonable limits.

The Court sees no difference between the situation in *Langley* and the facts in the present case. In *Langley,* the misrepresentation made by the lending bank was the amount of land and mineral rights actually involved in the transaction. Although one might seriously doubt that a bank would record permanently that it made such misrepresentations, theoretically at least, the borrowers could have made the bank document the actual amounts of land and mineral rights in the bank records or in the minutes of bank officer meetings. However, the fact that FRB, Riddles, and Suttles were defrauding the innocent investors (borrowers) was not a thing likely to be recorded in the bank's permanent records as "smoking gun" proof of its fraudulent intent.

The issue is not that the worth of the stocks was not recorded. Investors do not base their claim on an oral agreement as to the worth of the stocks. Rather, their claim is that the *sale* of stock was fraudulent. When FRB failed to disclose what it knew about the precarious financial situation of TNB and still encouraged and financed the stock sales, it was an active participant in defrauding the investors.

To require the defrauded investors to somehow show in the bank records—which are normally highly confidential records, available to no outsiders—that they had been defrauded would be to require unlikely conduct that would add the burden of "let the borrower beware" to "let the buyer beware" unless the borrower could make the bank record its fault for all—including the bank examiners—to see.

President Roosevelt, in the same letter to Congress previously mentioned, said: "This proposal [Securities Act of 1933] adds to the ancient rule of 'caveat emptor' the further doctrine 'let the seller beware.' It puts the burden of telling the whole truth on the seller. It should give some impetus to honest dealing in securities and thereby

---

**10.** *Eastside Church of Christ v. National Plan, Inc.,* 391 F.2d 357, 363 (5th Cir.), *cert. denied,* 393 U.S. 913, 89 S.Ct. 234, 240, 21 L.Ed.2d 198 (1968).

**11.** The Supreme Court also dealt with this issue in *Mills v. Electric Auto–Lite,* 396 U.S. 375, 90 S.Ct. 616, 24 L.Ed.2d 593 (1969). The Court also said that "void" should be read as "voidable" to protect the rights of the innocent party. However, they point out that because the statute uses the "void" language it "establishes that the guilty party is precluded from enforcing the contract against the unwilling innocent party." *Mills,* 396 U.S. at 386, 90 S.Ct. at 622, 24 L.Ed.2d at 603. The concern of the Court is to protect the innocent party. In this case, the innocent, unwilling, party is better served by reading the language as "void".

**12.** 12 U.S.C. § 1823(e).

bring back public confidence." [13] If the investors are forced to show in the bank records that the bank intended to defraud them, the burden is unfairly shifted to the innocent party when it should be the seller-lender who bears the burden of fair dealing.

If the issue was the unrecorded representation that the stock was worth more than it actually was, there would be no problem in the application of *D'Oench, Duhme*. As the Court correctly points out, "No authority suggests a right to be compensated by the federal government because one's investments fail." However, investors have the right to expect the protection of federal statutes when the failure comes about due to the actions of the lending bank in connection with the sale of stock.

There were no secret agreements exchanged which excused the payment of the notes. What excuses payment is the conduct of the lending bank in violation of the Securities Act. Nothing in *D'Oench, Duhme* would require the statutorily defrauded borrower-victim to attempt to comply with the recording requirements. *D'Oench, Duhme* ought not to apply because the investors are not trying to enforce a secret or an unwritten agreement but rather are seeking to enforce a statutory right to fair dealing.

## II.

The reason that the federal common law would estop state and common law fraud defenses is simply because there is an overriding public policy consideration for a uniform federal rule when dealing with the FDIC.[14] In the leading 5th Circuit case, *Beighley v. FDIC*, 868 F.2d 776 (5th Cir. 1989), the court held that a plaintiff cannot assert fraud claims based on state or common law.

The FDIC says that there is no reason why this should not be extended to federal law fraud claims. They forget the principal reasons why these claims are barred in the first place, namely for the sake of uniformity and the necessity of the FDIC's reliance on the bank records. There is no reason why a fraud claim based on violations of the Securities Act should be barred. The need for uniformity is fulfilled by the fact that this is a *federal* statute, subject only to the vagaries of thirteen Federal Courts of Appeals with the ever present Moderators at the top.

The FDIC will still be able to rely on the bank records which would be available on the supposition that the lending bank is not required to make and keep the records of its own fraudulent conduct. The Holder in Due Course language in § 29 of the Securities Exchange Act protects the FDIC.[15] If the FDIC has actual knowledge of the federal security violation, it would not have to rely on those particular debts of the bank until a court decides if they are in fact valid.

I must emphasize that allowing the Securities Act as a defense to the repayment of loans acquired by the FDIC is a very narrow exception to the *D'Oench, Duhme* doctrine and § 1823(e). In the vast majority of cases, the act will not be available. And even when Securities Act fraud is involved, the actual knowledge requirement will be a tough hurdle to overcome. The Court's concern about excessive litigation is well taken, but in this case, unfounded.

Two policies collide—the policy assuring full knowledge of bank regulators, and the policy of assuring fair dealing in the sale of securities. Until Congress expressly makes the choice, I would hold that violation of the Securities Act is a defense (or

---

13. H.R. Report No. 85, 73rd Cong. 1st sess., —— (1933) (underline added).

14. "The Federal policy of uniformity of decision for cases arising under federal law would be obviated by a great diversity in results if identical transactions were subject to the vagaries of the laws of several states. Where such inconsistency in decisions would occur, state law is not an appropriate selection to aid in fashioning

federal common law." *Clearfield Trust Co. v. United States*, 318 U.S. 363, 367, 63 S.Ct. 573, 575, 87 L.Ed. 838 (1943), quoted from, Norcross, *The Bank Insolvency Game: FDIC Superpowers, The D'Oench Doctrine, and Federal Common Law*, 103 Banking L.J. 316, 343 (1986).

15. See *supra* note 8.

basis for affirmative relief) which neither *D'Oench, Duhme* nor § 1823(e) cuts off.

To the Court's failure to so hold, I respectfully dissent.